LAURA WOODEN, Respondent, v. THE WESTERN NEW YORK AND PENNSYLVANIA RAILROAD COMPANY, Appellant.

1. RAILROADS — FELLOW-SERVANTS. When a printed and posted rule of a railroad company requires the conductor of a freight train to apply for instructions and additional help, or to set off cars, before attempting to take his train over a summit with dangerous grades, if in doubt as to his ability to make the passage safely, the exercise of judgment by the conductor in determining, upon the apparent facts, not to take such extra precautions, is the mere performance of one of his ordinary duties as an employé, and does not transform him from a fellow-servant of a brakeman into a representative of the company, so as to render the company liable for an injury to a brakeman on the train, if suffered through such omission on the part of the conductor.

2. POSTED RULE — DISCRETION OF CONDUCTOR. Negligence is not to be imputed to a railroad company towards its brakemen in committing to the judgment of conductors of freight trains the determination as to action under a printed and posted rule of which all the employés had, or were chargeable with, knowledge, directing conductors to apply for instructions when in doubt as to their ability to take their train over a well-known dangerous summit in safety, and a careless or negligent performance of a conductor's duties under such rule is a risk assumed by his fellow-servants.

3. APPLIANCES ON LOCOMOTIVE. The furnishing of a freight locomotive, equipped with hand brakes only, instead of air or steam brakes, does not of itself render a railroad company liable for an injury suffered by one of its trainmen through the unchecked descent of a train down a steep grade, where there is no evidence that hand brakes were unusual or inadequate, or that one kind of brake was safer than another.

4. WRECKING OF TRAIN — EVIDENCE AS TO CONDITION OF ROADBED. The fact that rotten ties had been seen along a railroad track, proved by a witness who knew nothing about railroading, without any evidence that the roadbed was unsafe, or that the presence of rotten ties was the proximate cause of the wrecking of the train while running down a steep incline at great speed on a frosty night when the trainmen lost control of it, is not sufficient to allow the jury to infer that the roadbed was actually unsafe, or that the proximate cause of the accident was other than the loss of control of the train as it descended the hill.

*Wooden* v. *W. N. Y. & P. R. R. Co.* (5 Misc. Rep. 537), reversed.

(Argued November 1, 1895; decided November 26, 1895.)

APPEAL from order of the General Term of the Superior Court of the city of Buffalo, made November 9, 1893, which

sustained plaintiff's exceptions ordered to be heard in the first instance at General Term, set aside a nonsuit directed by the trial court and granted a new trial.

This action was brought to recover damages for the death of plaintiff's husband, alleged to have been caused by the negligence of defendant while he was in its employ.

The facts, so far as material, are stated in the opinion.)

*John G. Milburn* for appellant.   The conductor and Wooden were co-employees, and for any negligence on the part of the former in the management of the train at Keating Summit the defendant is not liable.   (*Crispin* v. *Babbitt*, 81 N. Y. 516 ; *McCosker* v. *R. R. Co.*, 84 N. Y. 77 ; *Sherman* v. *R. R. Co.*, 17 N. Y. 153 ; *Slater* v. *Jewett*, 85 N. Y. 61 ; *Loughlin* v. *State*, 105 N. Y. 159 ; *Besel* v. *N. Y. C. & H. R. R. R. Co.*, 70 N. Y. 171 ; *Cullen* v. *Norton*, 126 N. Y. 1 ; *Hussey* v. *Coger*, 112 N. Y. 614.)   The plaintiff failed to show that the accident was due to any negligence on the part of the conductor.   (*Henry* v. *R. R. Co.*, 81 N. Y. 373 ; *Baulec* v. *R. R. Co.*, 59 N. Y. 366 ; *Hayes* v. *R. R. Co.*, 97 N. Y. 259 ; *Taylor* v. *City of Yonkers*, 105 N. Y. 209 ; *Dobbins* v. *Brown*, 119 N. Y. 188 ; *Pauley* v. *S. G. & L. Co.*, 131 N. Y. 90.)   Even if the conductor was at fault it was an error of judgment on his part, and not negligence.   (*Baulec* v. *R. R. Co.*, 59 N. Y. 364.)   The deceased by continuing in the service of the company with knowledge of the defendant's method of operating its trains over Keating Summit provided in the order, and of the discretion confided to the conductor, assumed the risk of it.   (*Corcoran* v. *D., L. & W. R. R. Co.*, 126 N. Y. 673 ; *Williams* v. *R. R. Co.*, 116 N. Y. 628 ; *De Forest* v. *Jewett*, 88 N. Y. 263 ; *Haskins* v. *R. R. Co.*, 65 Barb. 129 ; 56 N. Y. 608.)   There is no evidence from which the jury could have found the defendant negligent as to its roadbed or that any defect in the roadbed was the cause of this accident.   (*Borden* v. *D., L. & W. R. R. Co.*, 131 N. Y. 671 ; *Dobbins* v. *Brown*, 119 N. Y. 188.)

*Harlow C. Curtiss·* for respondent. This action is prop-
erly brought by plaintiff, as widow, for the benefit of herself
and her children. (*Wooden* v. *R. R. Co.*, 126 N. Y. 10;
*Laning* v. *N. Y. C. & H. R. R. R. Co.*, 49 N. Y. 521; *Bourke*
v. *Witherbee*, 98 N. Y. 562; S. & R. on Negligence, § 92;
*Fuller* v. *B. & A. R. R. Co.*, 80 N. Y. 46; *Cone* v. *D., L.
& W. R. R. Co.*, 81 N. Y. 208; *Burt* v. *N. Y., L. E. & W.
R. R. Co.*, 107 N. Y. 374.) The plaintiff's deceased husband
had a right to rely upon the assurance that the defendant had
provided him with a safe place to perform his work, and with
suitable machinery and appliances with which to operate the
same, and that, if the place should be made dangerous by facts
and conditions which were likely, or which defendant ought
to have known were likely, to exist and operate in creating a
condition of more than ordinary danger, the defendant would
have made the place safe by supplying means to overcome
such danger. (*Salters* v. *D. & H. C. Co.*, 3 Hun, 338; *Ben-
zing* v. *Steinway*, 101 N. Y. 552; *Durkin* v. *Sharp*, 38 N.
Y. 226; *Hawley* v. *N. C. R. R. Co.*, 82 N. Y. 370; *Pantzar*
v. *T. F. I. M. Co.*, 99 N. Y. 372.) Where, however, the
defect is apparent, it may require skill and judgment not
possessed by ordinary observers or by the servant, to give
knowledge of hazards which may be apprehended therefrom.
He does not assume those hazards. (*Davidson* v. *Cornell*,
132 N. Y. 228.) The defendant owed the duty to its servants
of properly inspecting and examining the track when it had
been made slippery by frost, before requiring any servant to
perform the work of taking a train down an average grade of
110 feet per mile for a distance of five and one-half miles.
(*Frank* v. *Otis*, 48 Hun, 617; *Fuller* v. *Jewett*, 80 N. Y. 50;
*Corcoran* v. *Holbrook*, 40 N. Y. 372; *Hawley Case*, 82 N. Y.
370; *Goodrich* v. *N. Y. C. & H. R. R. R. Co.*, 26 N. Y. S.
R. 768.) In clothing the conductor with the sole discretion
as to whether the train was safe or ·not to take over the
mountain, the defendant should have promulgated and
enforced rules regulating the conduct of its business, rela-
tive to inspecting the place of work, in this instance the

track as well as the train, and in failing to do so, was guilty of negligence. (*Abel* v. *D. & H. C. Co.*, 103 N. Y. 583; *Forey* v. *S. B. & N. Y. R. R. Co.*, 46 Hun, 678; *Bushby* v. *N. Y. C. & H. R. R. R. Co.*, 107 N. Y. 374.) When life is at stake, the law demands that care shall be taken to provide as far as possible against all contingencies; it is the duty of the master to take reasonable care to protect the servant from accident, as the exigencies of the situation require. (*O'Laughlin* v. *N. Y. C. & H. R. R. R. Co.*, 9 N. Y. S. R. 387; *Sheehan Case*, 91 N. Y. 332; *Hough* v. *Ry. Co.*, 21 Alb. L. J. 129; *Lilly* v. *N. Y. C. & H. R. R. R. Co.*, 107 N. Y. 566; *Seybolt* v. *N. Y., L. E. & W. R. R. Co.*, 95 N. Y. 362.) The fact that the defendant had often taken similar trains over without accident is not enough to remove the onus of negligence. (*Stringham* v. *Hilton*, 111 N. Y. 188; *Laning Case*, 49 N. Y. 521; *Ellis* v. *N. Y., L. E. & W. R. R. Co.*, 95 N. Y. 551; *Canfield* v. *B. & O. R. R. Co.*, 93 N. Y. 532; *Dana* v. *N. Y. C. & H. R. R. R. Co.*, 92 N. Y. 639; *Sheehan* v. *N. Y. C. & H. R. R. R. Co.*, 91 N. Y. 332; *Durkin* v. *Sharp*, 88 N. Y. 225; *Booth* v. *B. & A. R. R. Co.*, 73 N. Y. 38; *Plank* v. *N. Y. C. & H. R. R. R. Co.*, 60 N. Y. 607; *Flike* v. *B. & A. R. R. Co.*, 53 N. Y. 550.) The defendant constituted the conductor, *pro hac vice*, its *alter ego*. And in performing the duty of deciding whether the train as made up was safe or not for its particular and special work, the conductor was not therein acting as the conductor, a fellow-servant of the deceased brakeman, but he was the company itself. For no one of these duties (*i. e.*, to furnish safe and suitable place, and machinery and appliances) can be delegated by the master to a servant of any grade so as to exonerate the master from responsibility to another servant who has been injured by its non-performance. (*Pantzar* v. *T. F. I. M. Co.*, 99 N. Y. 368; *Laning* v. *N. Y. C. R. R. Co.*, 49 N. Y. 541; *Benzing* v. *Steinway*, 101 N. Y. 547; *Probst* v. *Delamater*, 100 N. Y. 273; *Malone* v. *Hathaway*, 64 N. Y. 5; *Fuller* v. *Jewett*, 80 N. Y. 53; *Ellis Case*, 95 N. Y. 546; *Slater* v. *Jewett*, 85 N. Y. 61; *Flike* v. *B. & A. R. R. Co.*, 53 N.

Y. 549; *Crispin* v. *Babbitt*, 81 N. Y. 521; *Corcoran* v. *Holbrook*, 59 N. Y. 517; *Hussey* v. *Coger*, 112 N. Y. 614; *Tendrup* v. *J. S. Co.*, 51 Hun, 464.) The plaintiff's intestate did not assume risks latent in his employment, but it is the master's duty to inform him. (*Cone* v. *D., L. & W. R. R. Co.*, 81 N. Y. 206; *Burt* v. *N. Y., L. E. & W. R. R. Co.*, 107 N. Y. 374; *Anthony* v. *Leeret*, 105 N. Y. 591; *Ford* v. *Lyons*, 48 Hun, 512; *Bryant* v. *N. Y. C. R. R. Co.*, 62 N. Y. S. R. 670; *Fredenburg* v. *N. C. R. R. Co.*, 114 N. Y. 585; *Slauson* v. *A. R. Co.*, 60 N. Y. 607; *McGovern* v. *C. V. R. R. Co.*, 123 N. Y. 291; *Vosburgh* v. *L. S. & M. S. R. Co.*, 91 N. Y. 379; *Edgarton* v. *N. Y. C. & H. R. R. R. Co.*, 39 N. Y. 227; *Seybolt* v. *N. Y., L. E. & W. R. R. Co.*, 95 N. Y. 568.) There is no question of contributory negligence in this case. (*Galvin* v. *Mayor, etc.*, 112 N. Y. 223.) Defendant was chargeable with notice that this was a bad night. (*Benzing* v. *Steinway*, 101 N. Y. 552; *Ellis Case*, 95 N. Y. 546; *Slater* v. *Jewett*, 85 N. Y. 61.) In addition to the special and extraordinary dangers of this particular night, there was another and more serious danger, which the defendant knew, or ought to have known, and which the deceased did not know, and had no means of knowing, and is not chargeable with knowing, viz., a track on this long, steep and curved line of road, absolutely unsafe. This fact presented of itself, with everything else eliminated, a case which should have gone to the jury. (*McGovern* v. *C. V. R. R. Co.*, 123 N. Y. 281; *Bulkley* v. *P. H. I. O. Co.*, 17 N. Y. S. R. 436; *Goodrich* v. *N. Y. C. & H. R. R. R. Co.*, 26 N. Y. S. R. 768; *Fuller* v. *Jewett*, 80 N. Y. 50; *Hawley* v. *N. C. R. R. Co.*, 82 N. Y. 370; *Mann* v. *D. & H. C. Co.*, 91 N. Y. 500.) This risk arising from the defective tracks was not assumed by the deceased as an incident of his employment, for he did not know anything about the tracks, and had no means of knowing, as appears from Goodwin's evidence. (*Pantzar* v. *T. F. I. M. Co.*, 99 N. Y. 368; *Ford* v. *Lyons*, 48 Hun, 512.) To justify a non-suit the evidence must be such that no different

conclusions could be drawn from it than those drawn by the court as to defendant's negligence, the deceased's assumption of risk and alleged contributory negligence. (*Payne* v. *T. & B. R. R. Co.*, 83 N. Y. 572, 574; *Stackus* v. *N. Y. C. & H. R. R. R. Co.*, 79 N. Y. 464; *Ellis Case*, 95 N. Y. 546; *Kain* v. *Smith*, 89 N. Y. 375; *McNally* v. *P. Ins. Co.*, 137 N. Y. 390.) The plaintiff was entitled to go to the jury upon all the facts presented, and it was error of the learned trial court to order a non-suit. (*McNally* v. *P. Ins. Co.*, 137 N. Y. 390; *Pratt* v. *Ins. Co.*, 130 N. Y. 206.)

GRAY, J. In January, 1890, the plaintiff's husband lost his life, as the result of the wrecking of a train on the defendant's road, on which he was employed as a brakeman. The following were the circumstances, as we learn from the record before us. Between the stations of Olean and Emporium, the railroad passes down a steep incline or grade of 110 feet to the mile for five and one-half miles, southerly from a point called Keating Summit. At the foot of the incline is a point called Parker's Station. North of Keating Summit is Portage Station, from whence the ascent of the hill commences. There was a rule in the book of rules of the company, and an order was posted on its bulletin boards, which directed conductors as to the operation of trains over Keating Summit. In the language of the conductor in question:

" The order was to the effect that if we thought we had a train we could not handle either ask for help or ask to set off cars. If I had a train which in my judgment, which the conductor thought, was too heavy to take over the Summit either to apply for help or set off cars. Apply for help meant to wire Buffalo. The help they would give was, if they have got a spare man on the pusher, they would give you a brakeman from the pusher, and if they could not they would tell you to set off cars. Going south to Emporium you could wire from Portage Creek to Buffalo. At that point I would wire if I thought my train was too heavy. They would either make arrangements for help for me or tell me to set off my cars.

If I thought my train was all right, that it was not too heavy, I did not apply at all for instructions. I went right along with my train. In determining about the train at any time I had to take into account the state of the track. I would look the train over and use my own judgment as to that; look the train over as to what cars and the number and condition of the cars and the condition of the night."

On the night in question, a train was made up at Olean, containing between engine and caboose 33 oil and freight cars. It was in charge of a crew consisting of an engineer, fireman, conductor and three brakemen. The train was, according to the evidence of the conductor, plaintiff's principal witness, " nothing out of the way, it was not any more than we were supposed to draw." The company kept an engine at Keating Summit, called a " pusher; " from which an additional brakeman would be supplied, in response to a telegram to Buffalo for help; if the instructions did not direct to set off cars from the train. The conductor upon this night did not apply for instructions at Portage Station, upon commencing to cross the hill; because, as he says, " it was his judgment that he could take his train over safely  *  *  * he decided he did not need any help or to set cars off." When the train was crossing over the narrow space at the top of the hill, the conductor believed the brakemen commenced to set the brakes and to prepare for the steep descent; but he could not see distinctly. The train, however, got from under control and went down the grade with such immense velocity that, as it was said, the fire flew from the wheels. The practice was to set the brakes, while the train was " topping over " the hill, as quickly as possible, until enough were set to hold the train. How well their duty was performed by the brakemen we are not informed. In some way, control was lost of this train and it rushed down the incline; until, at the bottom of the hill near Parker's Station, the train was wrecked and all the cars left the track, except the caboose, in which was the conductor, and four cars next to it and the track was torn up for 900 or 1,000 feet. The dead body of the plaintiff's

intestate was found in the wreck. He had been several years in railroad service and for several months with the crew of this conductor; whose employment was upon the freight trains of defendant. He had gone over this part of the road a number of times.

Various grounds are assigned as constituting negligence on the part of the defendant, for which it should be held liable in damages to the plaintiff for causing her husband's death. The plaintiff argues that this was a dangerous place and that the rails were slippery with frost and "in clothing the conductor with the sole discretion as to whether the train was safe or not to take over the mountain, the defendant should have promulgated and enforced rules  *  *  *  relative to inspecting  *  *  *  the track as well as the train." The difficulty with this point is that there is no evidence that the company was derelict as to any such duty. Negligence in the performance of a duty to others must be established by facts, which allow of its reasonable inference. It will never be presumed, or left to surmise. There was a book of rules, from which plaintiff offered in evidence several; though they are not in this record, and we cannot assume that any proper rule was wanting, or attention would have been called to it. According to the evidence of the conductor, upon which the plaintiff's case mainly depends as to the immediate facts, he judged that he "could take his train over safely" and in determining not to apply for any directions he "exercised his judgment and based it on the condition of the train as it was and everything bearing on the matter." He knew the night was frosty, what his train consisted of and what was the difficulty of passing a train over the hill from Portage at one side to Parker's at the other. All these facts were equally within the observation and knowledge of the train hands and the question really comes to this: was the conductor the representative of the master in determining not to apply for more brakemen, or to set off cars from the train, before proceeding from Portage Station? Was he merely performing one of his duties as an employé, or did he, *pro hac vice*, represent the

company? A further question is, if he was such, whether a neglect of duty was shown? Under the rule of the company, the decision of what was to be done at Portage certainly was committed to the conductor's judgment. But the first and obvious comment is, how could it be otherwise and what more could the company have done for the safety of its train hands than to print and post a rule, which directed conductors, when in doubt as to their ability to take their train over the summit, to apply for instructions? Of this rule and notice all concerned had knowledge, or were chargeable with it, and the situation being one as apparent to them as to the conductor, if he judged it safe to proceed where is the ground for the assertion of negligence in the company? The passage of this part of the road was at all times accompanied with the danger attending such steep grades. That, however, was a risk assumed by the deceased, while continuing in the employment of the company, and was known to him by experience. In taking this particular train over, there was nothing unusual, according to the evidence, and the conductor testified that his decision to do so was made after observing "the condition of the train as it was and everything bearing on the matter." That was a duty which had to be entrusted to some one and its performance was regulated and risks were guarded against by the company in the only conceivable way and that was by the printed and posted rule above referred to. A conductor of a railroad train is frequently called upon, in the proper exercise of his functions, to use his judgment; but it would be absurd to say, when exercising that judgment, that he was necessarily transformed from the mere servant to the agent, or representative, of the master. That he was the fellow-servant of the intestate in doing his ordinary work has been long settled. (*Slater* v. *Jewett*, 85 N. Y. 61.) The duty of the company, as of any other master, to its servants was performed if it furnished adequate machinery and suitable appliances for the work and employed competent fellow-servants, under proper rules, duly promulgated and adapted to the end of meeting possible emergencies of an ordinary or extraordinary charac-

ter, which might be foreseen to arise in the conduct of its opera-
tions.  It is only when the duty to be performed is one which
the master is supposed to do in person for his servant's safety
in his place of work, that it cannot be delegated to another so
as to free the master from responsibility for the consequences
of some neglect.  The duty here was not of that character.
It related to the performance of a part of the servant's ordi-
nary work and was regulated by the rule and published notice.
There is no pretense that the conductor was incompetent or
inexperienced.  A careless or negligent performance of his
duties was a risk assumed by his fellow-workmen.  Here, he
had before him a duty with respect to conducting the train at
a certain point, which was regulated by a rule and which was
to be governed by the apparent facts.  Nothing was defec-
tive about the appliances of the train; unless in the fact
insisted upon by the plaintiff that hand brakes were
used on this locomotive, instead of air, or steam, brakes.
But as to that fact, while we may assume that brakes might
be more quickly applied by the agency of compressed air, or
steam, there is no evidence that the hand brakes were
inadequate to the purpose, or unusual in hauling these trains.
To the contrary, the proof is that heavy freight engines on
the road were indifferently used with respect to their brakes
and it is not made to appear that the one kind was safer, or
more useful, than the other in such an emergency.  They had
proved adequate before and, if inference may be indulged in
from this evidence, the fault was not in the kind of brake
used on this engine, but in the setting of the brakes upon the
various cars as the train passed over the summit of the hill
and commenced its steep descent.  The conductor says: " I
first noticed something out of the way about the speed the
train was acquiring right at the top of the hill almost.  I saw
they were going too fast within a quarter of a mile of the top
of the hill."  Certainly, the evidence fails to show that the
momentum of this train could have been arrested, had the
locomotive been equipped with other than hand brakes and
we are left distinctly in doubt as to the point upon the train

where, under the circumstances, the brakes would be most
effectively applied. At any rate, there was no evidence that
the accident was attributable to the inadequacy of the brakes.
I think we are forced to the conclusion that this was an acci-
dent due to peculiar conditions of the track, or to the fault of
the brakemen in not seasonably applying the brakes ; or to a
combination of both causes. If the conductor was at fault
for failing to apply for instructions and additional help, then
his failure was with respect to a matter pertaining to his ordi-
nary work and was the dereliction of one servant towards his
fellow-servants in an emergency as to which the master had
provided by a rule, known to all and calculated to obviate the
possible peril of the employment. There was the peculiar
peril incident to the work of the deceased and he knew that
his master had sought to protect him against it by the promul-
gation of a rule for the conduct of the trains, and, so far as
we know, had employed competent fellow-servants and had
furnished a properly equipped train. It is impossible to see
in what respect the company was responsible for this lament-
able occurrence, or what more it could have done to guard
against it.

But the plaintiff, also, insists that the defendant was negli-
gent with respect to the condition of the roadbed and he
refers to evidence that some ties in the roadbed had rotted
between Keating Summit and Parker's Station. That was fur-
nished by one witness, who spoke of the condition of things
after the wreck had torn up the track and revealed the pres-
ence of a rotten tie, and by another witness, who said he had
noticed that the ties were defective, or partially rotten, along
the track, but where in particular was not stated by him. The
difficulty, however, with this evidence, as a subject for con-
sideration by the jury, upon the question of the defendant's
negligence, is that it would have been a matter of speculation
with them as to whether that was the cause of the accident.
There was no evidence that the roadbed was unsafe, or that
the presence of rotten ties was the proximate cause of the
wrecking of this train. The witness who had seen rotten ties

knew nothing about railroading. He admitted that he had seen the section boss and workmen at work putting in new ties from time to time, and it is a fact, which we might assume knowledge of, that ties must become worn out, or defective, and are to be replaced from time to time. In order to infer an unsafe condition of the railroad track, we should have some evidence to that effect from persons capable, by reason of experience and observation, to speak to the fact. No evidence here reveals a failure on the part of the company to inspect, or to keep its track in an ordinary safe condition. It had proved sufficient in the past; it was being renewed from time to time and, save for the terrific strain, it might have answered every purpose in the future. To allow the jury to infer, because of the testimony of a witness that he had casually observed rotten ties in the roadbed, that this train, rushing down this steep grade, beyond the control of its brakes and with increasing momentum, would not have been wrecked except for the presence of some rotten ties, would be to allow them to indulge in very wild guesswork. A track safe for the ordinary operation of trains might, and probably would be, inadequate to meet the strain of a train running headlong down a steep grade and it could not reasonably be said, in the absence of some evidence that the roadbed was actually unsafe for the operation of trains, that the proximate cause of the accident was other than the loss of control of the train as it descended the hill.

We have considered the rulings upon the trial and cannot find that any error was committed and we think that the order of the General Term, which granted a new trial upon the plaintiff's exceptions, should be reversed and judgment of non-suit should be ordered for the defendant as directed in the trial court.

All concur.

Ordered accordingly.