LUELLA G. TUELL, as Administratrix, etc., of WILLIAM M. TUELL, Deceased, Respondent, *v.* LEHIGH VALLEY RAILROAD COMPANY, Appellant.

Fourth Department, November 15, 1922.

Railroads — action under Federal Employers' Liability Act for death of engineer while operating second engine of freight train — freight train entered yards ahead of time and at excessive speed and collided with yard train standing on main track — intestate was negligent — negligence did not prevent recovery if defendant was negligent also — yard train properly on main track under rules of defendant — rear end properly protected by flagman — stalling of yard engine not caused by negligence — res ipsa loquitur not applicable — plaintiff failed to sustain burden of proving defendant negligent.

Plaintiff's intestate, who, at the time of the accident, was the engineer in charge of the second engine on a regular freight train, was guilty of contributory negligence, as it appears that the freight train, which ran into the rear end of a yard train standing on the main track at a station, was ahead of time and was running at an excessive rate of speed in violation of the rules of the defendant.

But as this action is under the Federal Employers' Liability Act the negligence of the plaintiff's intestate will not prevent a recovery if the defendant was negligent also.

It was not negligence for the defendant to place the yard train on the main track ahead of the on-coming freight train, for under the rules of the defendant it was permissible provided protection was given to the rear end of the train by a flagman, and there is no dispute in this case but that the rear end of the train was properly protected by a flagman who signaled the freight train to stop.

There was no evidence that the stalling of the yard engine attached to the yard train was due to negligence in operating the engine, or that the engine was in a defective condition or was not a proper and suitable engine to use.

The rule of *res ipsa loquitur* does not apply and the mere fact that the yard engine stalled did not establish negligence on the part of the defendant.

The plaintiff, having failed to sustain the burden of proving that the defendant was negligent, the judgment must be reversed and a new trial granted.

APPEAL by the defendant, Lehigh Valley Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Cayuga on the 28th day of October, 1921, upon the verdict of a jury for $12,000, and also from an order entered in said clerk's office on the 27th day of October, 1921, denying defendant's motion for a new trial made upon the minutes.

*Brainard & Noble* [*H. D. Noble, Jr.*, of counsel], for the appellant.

*William E. Fitzsimmons*, for the respondent.

HUBBS, J.:

The defendant operates a single-track railroad which extends from Sayre, Penn., on the south, to North Fair Haven, N. Y., on the north. It passes through the city of Auburn.

The plaintiff's intestate was an engineer in the employ of the defendant and had been so employed for many years. He met his death in an accident which occurred in the defendant's yard at Auburn. He was at the time in charge of the second locomotive hauling a freight train which was coming into the yard from the south. There were two engines drawing the train. There are many switches on the main line through the yard and many branch tracks leading therefrom. The track crosses several city streets and in places the view of an engineer on a locomotive coming from the south is obstructed. There is a down grade for about three miles from the south to near the point of the accident.

The defendant had a rule (No. 93) in its general book of rules which read as follows: " Other trains must run prepared to stop at any point within yard limits." That rule applied to the freight train coming from the south upon which the deceased was working. The usual speed of freight trains in the yard was from seven to ten miles an hour. On the morning in question, at about seven o'clock, an engine, with its crew, was sent to haul a string of forty-two cars from a siding out on to the main line and to take them to Throop, about three miles north of Auburn station, to the distributing yard. The engine coupled on to the cars and hauled them out on the main track and started north with them, but the engine stalled on an up-grade near the station.

Yardmaster Train, who had been acting with the shifting crew, was on the track south of the rear end of the stalled string of cars. He noticed that the engine was stalled. About that time he heard the whistle of freight train No. 1139, upon which the deceased was one of the engineers. The yardmaster notified trainman Danahey, who had started from the rear end of the stalled cars, to go south with a red flag, that he would go back and stop No. 1139. There

is a curve 2,400 feet south of the point where the rear end of the stalled cars stood. When train No. 1139 came around that curve the engineer could not see the rear end of the stalled train, but at that time the yardmaster was in plain view of the engineers on train No. 1139. He gave the stop signal while standing on the main track. The engineer on the first engine acknowledged it by sounding one short blast on the whistle. The train did not stop and the yardmaster continued to give the stop signal, which was answered by the engineer sounding another short blast on the whistle. The trainman also waved his red flag from the point where he stood, which was north of the yardmaster. The train did not stop but crashed into the rear of the standing cars and the plaintiff's intestate was killed.

Had the train been running at from seven to ten miles an hour, with the brakes in proper working condition, it could have been stopped within about 100 feet after the engineer acknowledged the stop signal given by the yardmaster. The train was going much faster than was customary and in violation of the rules. When only 400 feet south of the stalled cars it was traveling at least twelve to fifteen miles per hour. Expert testimony was offered by the defendant, based on actual experiments made at the same place under similar conditions. That testimony was to the effect that the train, if going twenty-five miles per hour, could have been stopped in time if the brakes had been in good working order and they had been applied 1,700 feet south of the standing cars, that being the point where the engineers could first see them.

The plaintiff's intestate was the engineer on the second engine. Ordinarily, under rule No. 1037 of the defendant's general rules, it was the duty of the engineer on the first engine to operate the air brakes, bell and whistle. Rule No. 59 of the defendant's air-brake rules provided, however, that the engineer on the second engine should " be ready to assume control of the train brakes immediately, should occasion require." The air brakes are so arranged that they can be operated from the second engine.

The trial court charged the jury that the defendant had promulgated rules which were sufficient and suitable; also that the engines and equipment were without defects. In those respects, under the charge of the trial court, the defendant had complied with the duty imposed upon it by law. (*Wooden v. W. N. Y. & P. R. R. Co.*, 147 N. Y. 508.) The trial court submitted to the jury the question of whether or not the defendant was negligent in permitting the string of cars to stand on the main track while the freight train was approaching from the south, and if that was negligence, whether or not it was the proximate cause of the collision.

Defendant's general rule No. 93 provided that yard engines might use the main track within yard limits without working train orders, subject to rule No. 99, which provided as follows:

" 99. When a train stops or is delayed, under circumstances in which it may be overtaken by another train, the flagman must go back immediately with stop signals and proceed rapidly to a distance sufficient to insure full protection, where he must remain until called in, or if an approaching train is within sight or hearing, until it has stopped. On reaching the required distance, or on the approach of a train before that distance is reached, he will display stop signals, and, in addition, place two torpedoes on the rail three lengths apart."

It is conceded that the stop signal was given in time and a sufficient distance from the standing cars to enable the engineers on the oncoming freight train to stop it, if it had been coming at the customary rate at which trains were operated in the yard or at the rate provided in the rules, provided the air brakes operated properly.

The defendant also had a general rule, No. 1037, which required engineers to stop their trains and not to run past a flagman until they ascertained the reason for being flagged.

The conductor of the yard crew was informed that train No. 1139 had left Freeville, south of Auburn, at six-forty o'clock A. M. Under the time table rules it would take it seventy-two minutes to run to Auburn. If it had not run ahead of time, the yard crew would have had about twenty-five minutes within which to move the string of cars on to the main track and out of the way of the oncoming freight train, No. 1139, which came to the point of the accident about ten minutes ahead of time.

When the locomotives on train No. 1139 reached a point where the engineers could see the rear of the stalled train they were about 1,700 feet south of it. The engineer and fireman on both engines left their places in the cabs and got down into the gangway. Between that time and the time of the collision both engineers went back into their cabs and both were killed. At a point 1,700 feet south of the standing cars there would have been ample time to stop the train if it had been traveling at the speed required by the rules and at the speed at which trains customarily traveled through the yard.

There is no dispute but what the freight train No. 1139 approached Auburn at a rate of speed in excess of that permitted by the rules, and that it came into the yard and passed through it to the place of the accident at an excess rate of speed. It is urged that the violation of the rules by the plaintiff's intestate was the cause of the

17

accident. This action is under the Federal Employers' Liability Act (U. S. Comp. Stat. 1916, §§ 8659, 8660; 35 U. S. Stat. at Large, 65, chap. 149, as amd. by 36 id. 291, chap. 143; 35 id. 66, §§ 3, 4), and even though the deceased was negligent, still there might be a recovery, if the defendant was negligent. The negligence of the deceased would affect the amount of the recovery unless his negligence was the sole cause of his death, in which event there could be no recovery.

Therefore, the question remains as to whether or not the defendant was negligent in drawing the string of cars out on the main track ahead of the oncoming freight train upon which the deceased was an engineer, and whether or not it was negligent in handling the engine and cars after they were drawn out on the main track. Under general rule No. 93 the yard engine had a right to use the main track, subject to general rule No. 99, which provided for the protection of the rear end of the cars by sending back a flagman. There is no dispute but what that was properly done, and that the engineer on the first engine on the freight train received the signal. The yard engine was operating properly under the rules and the learned trial court charged that the rules were adequate and proper. There could be no recovery, therefore, upon the ground that the yard engine and cars were negligently on the main track. There is no evidence that there was negligence in operating the yard engine which caused it to stall or that it was used in a defective condition, or that it was not a proper and suitable engine to use. The rule of *res ipsa loquitur* did not apply and the mere fact that the engine stalled did not establish negligence on the part of the defendant.

As the record stands the only negligence shown was that of the engineers on the freight train in running through the yard at excessive speed in violation of the custom of the yard and the defendant's rules. Why the air brakes were not applied is not explained. We may speculate upon that subject, but there is no evidence which throws any light. It is strange that experienced engineers, who knew the rules and the dangers to be encountered in the yard, should have run at an unusually high rate of speed and failed to operate the air brakes when they received the signal to stop. It may be surmised that the brakes would not work and that they were helpless, but there is no evidence to sustain such assumption. No reference was made upon the trial to the Federal Safety Appliance Act of 1893 (27 U. S. Stat. at Large, 531, chap. 196; Id. 531, § 1; Id. 532, § 8; U. S. Comp. Stat. 1916, §§ 8605, 8612).

Neither was it suggested in the complaint, bill of particulars or charge of the court that there might be a recovery because of the negligence of the engineer upon the first locomotive in running it

at excessive speed or failing to stop on signal. That question has not been suggested in the briefs filed in this court.

As the record stands the plaintiff failed to sustain the burden of proving that the defendant was negligent, and the judgment should be reversed and a new trial granted, with costs to the appellant to abide the event.

All concur.

Judgment and order reversed upon questions of law and new trial granted, with costs to appellant to abide event.